## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Marilyn Demory, on behalf of herself and all similarly situated persons,<br><br>                Plaintiff,<br><br><br>       v.<br><br><br>STATE STREET CORPORATION, RONALD E. LOGUE, EDWARD J. RESCH, PAMELA D. GORMLEY, JAMES J. MALERBA, GOLDMAN, SACHS & CO., MORGAN STANLEY & CO. INCORPORATED, CREDIT SUISSE SECURITIES (USA) LLC, LEHMAN BROTHERS INC., UBS SECURITIES LLC, TENLEY E. ALBRIGHT, KENNETT F. BURNES, TRUMAN S. CASNER, PETER COYM, NADER F. DAREHSHORI, AMELIA C. FAWCETT, ARTHUR L. GOLDSTEIN, DAVID P. GRUBER, LINDA A. HILL, CHARLES R. LAMANTIA, MAUREEN J. MISKOVIC, RICHARD P. SERGEL, RONALD L. SKATES, GREGORY L. SUMME, DIANA CHAPMAN WALSH, ROBERT E. WEISSMAN, and ERNST & YOUNG LLP,<br><br>                Defendants. | Master File No.<br><br>**JURY TRIAL DEMANDED**<br><br><br>**ECF CASE**<br><br><br><br><br><br><br>         <u>**COMPLAINT**</u> |

Plaintiff Marilyn Demory ("Plaintiff"), by and through counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by State Street Corporation ("State Street" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press

releases and media reports issued by and disseminated by State Street; and (c) review of other publicly available information concerning State Street.

## SUMMARY OF THE ACTION

1.      This is a federal class action on behalf of all those who purchased or otherwise acquired State Street's publicly traded securities between October 17, 2006 and October 19, 2009, inclusive (the "Class Period") and persons who purchased or otherwise acquired State Street's common stock pursuant and/or traceable to a registered public offering conducted on or about June 3, 2008 (the "Offering").  Plaintiff seeks remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff and the Class collectively lost billions of dollars because State Street misrepresented its financial condition, including the Company's exposure to billions of dollars in investment losses and the fraudulent inflation of the Company's trading revenues.  Through this action, Plaintiff and the Class seek to recover the losses incurred as a result of Defendants' violations of the Securities Act and the Exchange Act.

2.      State Street—which for years has portrayed itself as a conservative bank dedicated to protecting the interests of its institutional clients—took on significant undisclosed risks and failed to disclose losses when those risks materialized, misleading investors regarding the Company's exposure to billions of dollars in losses on investments in off-balance sheet conduits, in the Company's securities lending program and in its own investment portfolio. Instead of disclosing these mounting problems, State Street sought to shore up its capital position by issuing materially false and misleading offering materials that enabled the Company to raise approximately $2.8 billion from the investing public in a registered public offering of State Street common stock in June 2008.  State Street could not conceal these issues indefinitely, however.  When the Company's losses were eventually disclosed in January 2009, the value of

State Street securities plummeted, wiping out over $9 billion in market capitalization in a single day.

3.    Specifically, on Friday, January 16, 2009, after the close of the markets before the Martin Luther King, Jr. holiday weekend, State Street issued a Form 8-K providing new risk warnings that revealed, among other things, that the Company was exposed to substantial and previously undisclosed risks, including (1) losses, customer claims and reputational risk arising from the investment of cash collateral in State Street's securities lending program; (2) unrealized losses in the Company's portfolio of investment securities; and (3) losses and liquidity risk associated with State Street's off-balance sheet "conduits."   State Street's conduits are off-balance sheet entities sponsored and managed by the Company, which purchase long-term investments, primarily asset-backed securities, and fund those purchases by selling short-duration commercial paper.

4.    The losses and risks identified in the January 16, 2009 filing were detailed in a SEC filing released prior to the opening of the markets on January 20, 2009 (the following business day) in which the Company pre-announced its 2008 fourth quarter and year-end financial results, revealing to investors that many of the risks it warned about in its January 16, 2009 filing had already been realized.  Specifically, on January 20, 2009, the Company reported fourth quarter earnings of $65 million, or $0.15 per share—a decline of 71% from the prior year-ago period and a significant variance from analysts' expectations of a profit of $1.14 per share. The Company also disclosed that it had incurred unrealized losses in the very areas where, just days earlier, it had first warned investors about potential risks.

5.    The Company also disclosed that unrealized mark-to-market losses in State Street's investment portfolio had risen to $6.3 billion at the end of the fourth quarter, up $3 billion from the end of the third quarter, and that unrealized losses in State Street's conduits had

6.      The market's reaction to these shocking disclosures was swift and severe, with State Street stock plummeting almost 60% in a single day, from a close of $36.35 per share on January 16, 2009 to $14.89 per share on January 20, 2009.  This stock decline alone wiped out over $9 billion in shareholder value.  But even after these disclosures, State Street continued to mislead investors regarding its scheme to siphon off millions of dollars from its institutional clients by fraudulently overcharging for foreign currency trades and the trading revenues the Company derived from that scheme.

7.      Then, months later, investors were dealt another blow when it was disclosed that State Street had been systematically overcharging its institutional clients for almost a decade through an illegal scheme involving foreign currency ("FX") trades.  On October 20, 2009, California Attorney General Edmund G. Brown Jr. announced the filing of a complaint setting forth facts demonstrating that State Street had committed what the Attorney General termed an "unconscionable fraud" against California's two largest pension funds—California Public Employees' Retirement System ("CalPERS") and California State Teachers' Retirement System ("CalSTRS")—by improperly overcharging CalPERS and CalSTRS for the costs of executing

foreign currency trades since 2001.  According to the Attorney General, there are several other sealed *qui tam* cases pending in other states that allege claims arising from State Street's illegal FX trading scheme.  Indeed, the *qui tam* complaint that gave rise to the Attorney General's action makes clear that the alleged FX trading scheme was not limited to CalPERS and CalSTRS.

8.    In response to the disclosure of the FX allegations, State Street common stock dropped $4.41 per share, nearly 8.5%, on unusually heavy volume.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o); and under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

10.    This Court has jurisdiction pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v); Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. §§ 1331 and 1337.

11.    Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v); Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. § 1391(b) and (c).  Substantial acts in furtherance of the alleged violations of the federal securities laws or the effects of these violations have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District.  Additionally, State Street maintains its principal executive offices within this Judicial District.

12.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities

exchange.

## PARTIES

### Plaintiff

13.     Plaintiff Marilyn Demory, as set forth in the accompanying certification, incorporated by reference herein, purchased State Street common stock during the Class Period and on the Offering (defined below), and suffered damages as a result of the federal securities law violations and false and misleading statements and/or material omissions alleged herein.

### State Street

14.     Defendant State Street is a Massachusetts corporation with its principal executive offices located at One Lincoln Street, Boston, Massachusetts, 02111.

### Executive Defendants

15.     Defendant Ronald E. Logue ("Logue") was, at all relevant times, Chairman of the Board of Directors and Chief Executive Officer ("CEO") of State Street, and served as President and Chief Operating Officer ("COO") of State Street from 2000 until April 30, 2008. Defendant Logue signed the Shelf Registration Statement (defined below).

16.     Defendant Edward J. Resch ("Resch") was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of State Street.  Defendant Resch signed the Shelf Registration Statement.

17.     Defendant Pamela D. Gormley ("Gormley") was, at all relevant times, Executive Vice President and Corporate Controller until December 21, 2006, and thereafter, Executive Vice President and the head of corporate systems and operations.  Defendant Gormley signed the Shelf Registration Statement.

18.     Defendant James J. Malerba ("Malerba") has been employed by State Street since 2004 and has served as Senior Vice President and Corporate Controller of State Street since

19.     Defendants Logue, Resch, Gormley, and Malerba, are collectively referred to hereinafter as the "Executive Defendants."  The Executive Defendants, because of their positions with the Company, possessed the power and authority to control the contents of State Street's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

**Director Defendants**

20.     Defendant Tenley E. Albright, M.D., ("Albright") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

21.     Defendant Kennett F. Burnes ("Burnes") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

22.     Defendant Truman S. Casner ("Casner") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

23.     Defendant Peter Coym ("Coym") was, at times relevant hereto, a member of the Board of Directors.

24.     Defendant Nader F. Darehshori ("Darehshori") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

25.     Defendant Amelia C. Fawcett ("Fawcett") was, at times relevant hereto, a

member of the Board of Directors and signed the Shelf Registration Statement.

26.    Defendant Arthur L. Goldstein ("Goldstein") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

27.    Defendant David P. Gruber ("Gruber") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

28.    Defendant Linda A. Hill ("Hill") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

29.    Defendant Charles R. LaMantia ("LaMantia") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

30.    Defendant Maureen J. Miskovic ("Miskovic") was, at times relevant hereto, a member of the Board of Directors.

31.    Defendant Richard P. Sergel ("Sergel") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

32.    Defendant Ronald L. Skates ("Skates") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

33.    Defendant Gregory L. Summe ("Summe") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

34.    Defendant Diana Chapman Walsh ("Walsh") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

35.    Defendant Robert E. Weissman ("Weissman") was, at times relevant hereto, a member of the Board of Directors and signed the Shelf Registration Statement.

36.    Defendants Albright, Burnes, Casner, Darehshori, Fawcett, Goldstein, Gruber, Hill, LaMantia, Sergel, Skates, Summe, Walsh and Weissman are sometimes referred to herein as the "Director Defendants."

8

**Underwriter Defendants**

37.      Goldman, Sachs & Co. ("Goldman") was an underwriter of the Offering as specified herein.  As an underwriter of the Offering, Goldman was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

38.      Morgan Stanley & Co. Incorporated ("Morgan Stanley") was an underwriter of the Offering as specified herein.  As an underwriter of the Offering, Morgan Stanley was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

39.      Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Offering as specified herein.  As an underwriter of the Offering, Credit Suisse was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

40.      Lehman Brothers Inc. ("Lehman") was an underwriter of the Offering as specified herein.  As an underwriter of the Offering, Lehman was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

41.      UBS Securities LLC ("UBS") was an underwriter of the Offering as specified herein.  As an underwriter of the Offering, UBS was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

42.      Defendants Goldman, Morgan Stanley, Credit Suisse, Lehman and UBS are referred to herein as the "Underwriter Defendants."

**Auditor Defendant**

43.     Defendant Ernst & Young LLP ("Ernst & Young"), at all relevant times, served as an Independent Registered Public Accounting Firm for State Street.  Ernst & Young audited State Street's financial statements for the years ended December 31, 2006 and December 31, 2007, which financial statements were approved by Ernst & Young and included in State Street's Annual Reports for the years ended December 31, 2006 and December 31, 2007, which were filed on Form 10-K with the SEC and incorporated by reference into the Offering.  Ernst & Young consented to the incorporation by reference of its report of State Street's annual report on Form 10-K and to the incorporation by reference of its report in the Shelf Registration Statement at issue herein.  Ernst & Young is referred to herein as the "Auditor Defendant."

## SUBSTANTIVE ALLEGATIONS

### Background

44.     State Street is a provider of financial services including investment servicing, investment management, and investment research and trading. As of September 30, 2009, the Company had $17.9 trillion in assets under custody and administration and $1.7 trillion in assets under management.

45.     As set forth below, Plaintiff and members of the Class purchased State Street common stock at prices that were artificially inflated by material misstatements and omissions contained in SEC filings, conference calls, press releases and in offering materials issued in connection with the June 2008 offering of State Street common stock (as defined below).  Each of the Defendants is liable to Plaintiff and members of the Class for their role in disseminating and/or failing to correct these material misstatements and omissions.

46.     Specifically, the Company misled investors regarding its exposure to billions of dollars in losses on investments in off-balance sheet conduits, in the Company's securities

lending program and in its own investment portfolio. The Company's reported financial results were also inflated by millions of dollars throughout the Class Period from income derived from fraudulently pricing FX trades that State Street executed for its institutional investor clients. Defendants' fraudulent scheme and course of business: (i) deceived the investing public regarding State Street's business, operations, management, prospects, and the intrinsic value of State Street securities; (ii) caused Plaintiff and other members of the Class to purchase State Street securities at artificially inflated prices; and (iii) caused significant damages to Plaintiff and other members of the Class when the truth regarding State Street's financial condition and business operations was revealed.

47.     The statements set forth below concerning the Company's earnings, revenue growth, earnings, and financial performance—as well as its exposure to off-balance sheet conduits, losses arising from the Company's securities lending program and investment portfolio—were each false and misleading. As set forth herein, the Company's material misstatements and omissions inflated revenues and earnings, and, in some cases, violated state law regulations and subjected the Company to potentially significant penalties and fines and the loss of customer confidence.

**The June 2008 Offering**

48.     On or about June 3, 2008, the Company completed a $2.8 billion registered public offering of 35,715,000 shares of State Street common stock (the "Offering"). The Offering was conducted pursuant to a shelf registration statement which was filed with the SEC on Form S-3 on March 21, 2006 (the "Shelf Registration Statement"). Form S-3 is a so-called "shelf registration," which permits an issuer to register numerous different securities for later issuance in a single SEC filing. Once this "shelf" is established, the issuer may later "take down" securities from the shelf by issuing them to the public pursuant to a later-filed Prospectus,

Prospectus Supplement, and/or Pricing Supplement that refers investors to the underlying Form S-3.

49.    Specifically, the March 21, 2006 Shelf Registration Statement included a prospectus, dated June 2, 2008, and a prospectus supplement, dated June 3, 2008, that became part of the Shelf Registration Statement pursuant to which the offering was conducted.  The Shelf Registration Statement and the relevant prospectus and prospectus supplement are referred to collectively as the "Offering Materials."

50.    The Offering Materials incorporate by reference numerous other public filings of the issuer, such as annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K, including those filed both prior to and after the filing of the shelf registration statement.  The Offering Materials specifically incorporated by reference State Street's Annual Report on Form 10-K for the fiscal year ended December 31, 2007, the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008 and State Street's Current Reports on Form 8-K filed on January 3, 2008, January 17, 2008, January 25, 2008, April 7, 2008, May 5, 2008 and June 2, 2008.

51.    In State Street's Form 10-K for the year ended December 31, 2007, State Street's independent registered public accounting firm, Defendant Ernst & Young, expressed an unqualified opinion of its audit of the Company's "consolidated statement of condition of State Street Corporation as of December 31, 2007" and stated that "State Street Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007."  Ernst & Young consented to the incorporation by reference of its audit opinion concerning State Street's consolidated financial statements and the effectiveness of the Company's internal control over financial reporting in the Shelf Registration Statement. Furthermore, State Street stated in the Offering Materials that the financial statements set forth in

the Form 10-K for the year ended December 31, 2007 and the effectiveness of the Company's internal control over financial reporting were "incorporated herein by reference in reliance upon such reports given on the authority of such firm [Ernst & Young] as experts in accounting and auditing."

52.     The underwriters of the Offering—Goldman, Morgan Stanley, Credit Suisse, Lehman and UBS—that sold and distributed the 35,715,000 shares in the Offering to the investing public were obligated to ensure the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. The extent of the Underwriter Defendants' participation in the Offering was as follows:

| Underwriter Defendant | Extent of Participation (Number of Shares)[1] |
|---|---|
| Goldman | 19,643,250 |
| Morgan Stanley | 10,714,500 |
| Credit Suisse | 1,785,750 |
| Lehman | 1,785,750 |
| UBS | 1,785,750 |

53.     As described below, the Offering Materials contained untrue statements of material fact and material omissions, regarding, among other things, State Street's exposure to billions of dollars in losses on investments in off-balance sheet conduits, in the Company's securities lending program and investment portfolio, and failed to disclose that State Street's reported financial results were inflated through income improperly generated through State Street's FX trading activities.  State Street and the defendants in this action—including the professional gatekeepers who received hundreds of millions of dollars in fees for their role in

---

[1] Under the underwriting agreement, the Underwriter Defendants had an option to buy up to an additional 5,357,250 shares from State Street, which was exercised on June 6, 2008, and severally purchased, sold and distributed approximately the same proportion of shares to the public as set forth in the table above.

raising over $2.8 billion dollars from an unsuspecting investing public—failed in their obligation

to ensure the accuracy of State Street's public filings.  When the true extent of the Company's

financial condition began to be revealed, State Street common stock plunged in value in several

corrective disclosures that erased more than $10 billion in shareholder value.

**Defendants' Materially False and Misleading
Statements Issued During the Class Period**

54.     On October 17, 2006, State Street issued a press release entitled, "State Street

Corporation Achieves Third-Quarter EPS up 11% on Revenue Gain of 9% Driven by Solid

Performance in Servicing and Management Fees Compared to 2005 Expenses Decline 7% from

Second Quarter of 2006."  The press release stated, in relevant part:

> BOSTON--(BUSINESS WIRE)--Oct. 17, 2006--State Street Corporation
> announced today third-quarter earnings per share of $0.83, an increase of 11%
> from $0.75 earnings per share from continuing operations in the third quarter of
> 2005. The third-quarter 2006 results include a cumulative gain of $15 million, or
> $0.03 per share, in trading services revenue related to the Corporation's tax-
> exempt investment programs. The comparative 2005 results included a $16
> million, or $0.03 per share gain from the final settlement of the 2003 sale of the
> Corporation's Private Asset Management business. Revenue of $1.5 billion in
> the third quarter of 2006 is up 9%, or $127 million, compared to $1.4 billion in
> the year-ago quarter. Total expenses in the third quarter of 2006 of $1.1 billion
> are up 8%, or $82 million, compared to $1.0 billion in the year-ago quarter. For
> the third quarter of 2006, return on shareholders' equity is 16.4%, compared to
> 15.9% from continuing operations in the third quarter of 2005.
>
> * * *
>
> [State Street's chairman and chief executive officer Robert E.] Logue continued,
> "Compared to a strong quarter a year ago, the third-quarter results demonstrated
> the continuing growth in our servicing and management fee revenue, increasing
> 10% and 27%, respectively. These results were fueled by new wins, solid cross-
> selling to existing customers, as well as ongoing product innovation. We
> achieved modest positive operating leverage compared to the year-ago quarter.
> For the nine months revenues were up 16% and expenses increased 12%, also
> resulting in significant positive operating leverage."
>
> Looking forward, Logue concluded, "Through nine months we are performing
> above the high end of our ranges for revenue, earnings per share, and return on
> equity, all on an operating basis excluding the second-quarter tax charges. We

14

expect that we will moderately exceed the high end of the ranges we established for the full year."

55.    On a conference call held that same day, Defendant Resch provided additional detail on the performance of State Street's investment portfolio:

Floating-rate asset-backed securities now represent about 38% of the average investment portfolio, or $23.3 billion. Mortgage-backed securities now represent about 35%, or $21.5 billion, of the average investment portfolio. The credit quality of the portfolio has remained about the same as at year-end, 95% is invested in AAA- or AA-rated securities. As of September 30th, 2006, 89% was invested in AAA- and 6% in AA-rated securities, a slight increase in AAA and a corresponding decrease in AA.

We increased the average size of the portfolio from $55.1 billion a year ago to $61.2 billion in the third quarter.

56.    On November 3, 2006, State Street filed its Quarterly Report with the SEC on Form 10-Q for the 2006 fiscal third quarter. The Company's Form 10-Q was signed by Defendants Resch and Gormley and reaffirmed the Company's financial results previously announced on October 17, 2006. The Company's Form 10-Q also contained Sarbanes-Oxley-required certifications, signed by Defendants Logue and Resch, which stated, in relevant part:

I have reviewed this quarterly report on Form 10-Q of State Street Corporation;

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that

material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

\* \* \*

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

57.    On January 17, 2007, State Street issued a press release entitled, "State Street Reports  Fourth-Quarter Earnings Per Share of $.86, up 16%; for 2006, Revenue up 15%; EPS from  Continuing Operations up 14% and up 23% Excluding Q2 Tax Charges."  The press release stated, in  relevant part:

BOSTON--(BUSINESS WIRE)--Jan. 17, 2007--State Street Corporation today announced 2006 fourth-quarter earnings per share of $0.86 on net income of $291 million. Earnings per share increased 16% versus the 2005 fourth quarter's results of $0.74 per share on net income of $249 million. Total revenue of $1.622 billion in the fourth quarter of 2006 is up 15% from $1.416 billion in the fourth quarter a year ago. Expenses of $1.18 billion are up 13% from $1.04 billion in the year-ago quarter. For the fourth quarter of 2006, return on shareholders' equity of 15.9% is flat with the fourth quarter of 2005.

\* \* \*

Commenting on the performance, Ronald E. Logue, State Street's chairman and chief executive officer, said, "I'm pleased that we exceeded the financial goals we set for the year, helped by a favorable operating environment. Nearly every revenue item on our income statement increased in double digits on a year-over-

year basis, and we achieved positive operating leverage again this year. Our servicing fees continued strong. Revenue at State Street Global Advisors, our investment management arm, grew 26% in 2006 compared to 2005, and it is increasingly becoming a more meaningful contributor to State Street's results. Our strategy of more actively managing the balance sheet contributed to an annual increase of 21% in fully taxable-equivalent net interest revenue. Net interest margin equaled 1.24% for 2006. Additionally, our non-U.S. revenue now represents approximately 43% of total revenue, in line with our long-term goal of 50% over several years."

58.    That same day, Defendant Resch provided further detail to investors regarding income from State Street's securities lending and investment portfolio, stating, in relevant part:

> The positive comparisons to the prior year are principally due to a combination of five favorable factors. One, higher levels of customer deposits. Two, our ability to lag pricing on non-U.S. deposits. Three, a higher yield on reinvestments in our securities portfolio. Four, a higher level of low-cost funds. And five, the impact of the third quarter consolidation of the tax-exempt investments onto our balance sheet. We increased the average size of the portfolio from $58 billion a year ago to $65.7 billion in the fourth quarter.
>
> Floating-rate asset-backed securities now represent about 40% of the average investment portfolio or $26.2 billion.  Mortgage-backed securities now represent about 31% or $20.4 billion of the average investment portfolio. The credit quality of the portfolio has remained about the same as at last year end, 94% is invested in AAA or AA-rated securities. As of December 31, 2006, 88% was invested in AAA securities and 6% in AA-rated securities.
>
> * * *
>
> Securities finance revenue was up 3% and the duration of the securities lending book stands at 30 days as of the end of the quarter. Processing fees and other were down 6% or $4 million partially due to the consolidation of the tax-exempt investments onto our balance sheet in the third quarter. Improvements in our net interest revenue and net interest margin were significant both due to execution of our balance sheet strategy as well as favorable trends in the environment. As a result, our net interest revenue on a fully taxable equivalent basis increased by 18% compared to the third quarter, and net interest margin improved 10 basis points to 132 basis points.

59.    On February 20, 2007, State Street filed its Annual Report with the SEC on Form 10-K for the 2006 fiscal year. The Company's Form 10-K was signed by Defendants Resch and Malerba and reaffirmed the Company's financial results previously announced on January 17, 2007.  The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed

by Defendants Logue and Resch, substantially similar to the certifications contained in ¶56, *supra*.

60.    In addition, State Street's Form 10-K for the year ended December 31, 2006 included a report by its independent registered public accounting firm, Defendant Ernst & Young, which expressed an unqualified opinion of its audit, conducted in accordance with the standards of the Public Accounting Oversight Board (United States), that "the financial statements referred to above present fairly, in all material respects, the consolidated financial position of State Street Corporation at December 31, 2006 and 2005, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2006, in conformity with U.S. generally accepted accounting principles."  In the report, Ernst & Young also stated that "We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of State Street Corporation's internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 15, 2007 expressed an unqualified opinion thereon."  Ernst & Young consented to the incorporation by reference of its audit opinion concerning State Street's consolidated financial statements and the effectiveness of the Company's internal control over financial reporting in the Shelf Registration Statement.

61.    On April 17, 2007, State Street issued a press release entitled, "State Street Corporation Achieves Record Revenue of $1.7 Billion and EPS of $.93 in the First Quarter, Both up 11% versus Year-Ago Quarter." The press release stated, in relevant part:

> Tenth Consecutive Quarter of Positive Operating Leverage
>
> BOSTON--(BUSINESS WIRE)--April 17, 2007--State Street Corporation announced today first-quarter net income per share of $0.93, up 11% from earnings per share from continuing operations of $0.84 in last year's first quarter.

Operating-basis revenue of $1.708 billion in the first quarter of 2007, representing a State Street record for a quarter, is up 11.3% from $1.534 billion compared to the year-ago quarter. Total expenses in the first quarter of 2007 of $1.213 billion are up 10.7% from $1.096 billion compared to the year-ago quarter. As a result, State Street achieved positive operating leverage of approximately 60 basis points. Net income of $314 million for the quarter is up 11% from income from continuing operations of $282 million for the year-ago quarter. For the first quarter of 2007, return on shareholders' equity was 17.4% compared to 17.6% from continuing operations in the first quarter of 2006.

Ronald E. Logue, State Street's chairman and chief executive officer, said, "We continue to grow our revenue and earnings per share and generate return on equity consistent with our long-term goals. Our ability to control expenses and achieve positive operating leverage contributed to this result, while revenue from investment servicing and securities finance increased significantly. I'm particularly pleased with the performance of State Street Global Advisors this quarter, which continues to generate increased revenue and profit driven largely by demand from clients for its range of innovative enhanced and quantitative active investment strategies. Our net interest revenue and net interest margin continue to benefit from a favorable mix of customer deposits, especially from non-US customers. Trading services revenue declined moderately as foreign exchange markets were not as robust as they were in last year's first quarter, which, as we stated at the time, were unusually strong.

62.    That same day, Defendant Resch provided further detail to investors regarding

income from State Street's securities lending, trading services and investment portfolio activities,

stating, in relevant part:

Securities finance revenue was $98 million, up 21% from last year's first quarter due to an increase in assets on loan partially offset by slightly lower spreads. In the first quarter this year the average volumes of securities lent increased by almost 30% compared to a year ago. Processing fees and other revenue were up slightly to $73 million. Net interest revenue on a fully taxable equivalent basis increased $60 million or 22% from $277 million to $337 million. In addition, compared to the first quarter of 2006 net interest margin increased 22 basis points from 123 to 145 basis points.

The positive comparisons to the prior year are again principally due to a combination of favorable factors. Higher levels of customer deposits, our ability to lag pricing on non U.S. deposits in generally rising rate environments, a higher yield on reinvestments in our securities portfolio and a higher level overall of lower-cost funding. We increased the average size of the portfolio from $60 billion a year ago to $65.6 billion during the first quarter.

Mortgage-backed securities in the first quarter represented about 37% or $24.2 billion of the average investment portfolio. Floating-rate asset-backed securities in the first quarter of 2007 represented about 36% of the average investment portfolio or $23.9 billion. The

credit quality portfolio at March 31, 2007 has remained about the same as at last year end, 94% is invested in AAA or AA rated securities. As of March 31, 88% was invested in AAA securities and 6% in AA rated securities.

63.    On May 4, 2007, State Street filed its Quarterly Report with the SEC on Form 10-Q for the 2007 fiscal first quarter. The Company's Form 10-Q was signed by Defendants Resch and Malerba and reaffirmed the Company's financial results previously announced on April 17, 2007.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Logue and Resch, substantially similar to the certifications contained in ¶56, *supra*.

64.    On July 17, 2007, State Street issued a press release entitled, "State Street Corporation Achieves Record Revenue and Operating EPS in Second Quarter."  The press release stated, in relevant part:

> Positive Operating Leverage Continues Strong Momentum at Investors Financial as Customer Conversions Begin
>
> BOSTON--(BUSINESS WIRE)--July 17, 2007--State Street Corporation announced today second-quarter earnings per share of $1.07 compared to $0.68 per share for the second quarter of 2006, which included non-cash tax adjustments of $0.25 per share, or $0.93 per share without those adjustments. Revenue of $1.921 billion in the second quarter of 2007 represented a record and is up 16.4%, compared to $1.651 billion in the year-ago quarter. Total expenses in the second quarter of 2007 of $1.358 billion are up 15.5%, compared to $1.176 billion in the year-ago quarter. As a result, the Corporation generated about 90 basis points of positive operating leverage.
>
> * * *
>
> [State Street's chairman and chief executive officer Ronald E.] Logue added, "State Street Global Advisors, which grew 22 percent from last year's second quarter, continues to make a larger contribution to our bottom line as it places greater emphasis on its quantitative active strategies. We are pleased to achieve the eleventh consecutive quarter of positive operating leverage compared to the prior-year quarter. We also continued to benefit from our balance sheet strategy. We achieved 1.64 percent in net interest margin on a 44 percent improvement in fully taxable-equivalent net interest revenue."
>
> Logue concluded, "The results of Investors Financial in the second quarter were strong, like State Street's, and so we are revising our financial goals for 2007:

We now expect that revenue growth will be between 20 percent and 22 percent; up from 16 percent to 18 percent we forecast in February when we announced the deal.

*** 

Servicing fees are up 7% to $766 million and management fees are up 9% to $284 million, both due to new business and higher equity valuations. Trading services increased 18% to $260 million due to strength in foreign exchange volumes and brokerage. Securities finance revenue increased 65%, from $98 million to $162 million, due to improved spreads and seasonally high volumes. Processing fees and other revenue are down from $73 million to $65 million primarily due to lower fees from leasing and structured products. Net interest revenue on a fully taxable-equivalent basis increased $60 million, or 18%, to $397 million, compared to $337 million in the first quarter.

65.    That same day, Defendant Resch provided further detail to investors regarding

income from State Street's securities lending, trading services and investment portfolio activities,

stating, in relevant part:

Trading services revenue, which includes foreign exchange trading and brokerage and other services, was up about 1% to $260 million. Weaker volatility, partially offset by stronger volumes, drove a 9% decline in foreign exchange trading revenue. Foreign exchange trading revenue was down $18 million to $174 million compared with a record quarter in 2006….

Securities finance revenue was $162 million, up 27% from last year's second quarter due primarily to an increase on assets on loan. In the second quarter this year the average volumes of securities lent increased by more than 30% compared to a year ago and spreads were up slightly….

Net interest revenue on a fully taxable equivalent basis increased $122 million or 44% from $275 million to $397 million. In addition, compared to the second quarter of 2006, net interest margin increased 44 basis points from 120 to 164 basis points. The favorable trends that I cited during the first quarter call continued in the second quarter. Higher levels and a favorable mix of customer deposits, a continued favorable non-US rate environment, a higher yield on reinvestments in our securities portfolio and a higher level of lower-cost funds. We increased the average size of the portfolio from $59.4 billion a year ago to $67.7 billion during the second quarter.

Mortgage-backed securities in the second quarter of 2007 represented about 38% or $25.4 billion of the average investment portfolio. Floating-rate asset-backed securities in the second quarter of 2007 represented about 36% of the average investment portfolio or $24.4 billion. On a pro forma basis combined with Investors Financial, approximately 43% of the portfolio will be in mortgage-

backed securities and also about 43% in floating-rate securities. The total pro forma portfolio for the combined company would have been about $77 billion as of June 30, 2007.

The credit quality of the portfolio at June 30, 2007 has remained about the same as at last year end, 94% is invested in AAA or AA rated securities. As of June 30th, 87% with invested in AAA, and 7% in AA rated securities. As I have mentioned previously, the credit quality of the portfolio will remain relatively unchanged following the consolidation with Investors Financial.

66.    On August 3, 2007, State Street filed its Quarterly Report with the SEC on Form 10Q for the 2007 fiscal second quarter.  The Company's Form 10-Q was signed by Defendants Resch and Malerba and reaffirmed the Company's financial results previously announced on July 17, 2007.

67.    The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Logue and Resch, substantially similar to the certifications contained in ¶56, *supra*.

68.    On October 16, 2007, State Street issued a press release entitled, "State Street Corporation Reports Third-Quarter EPS up 10% Including Investors Financial Integration Costs. Record Operating EPS up 39% on Revenue Gain of 48% Compared to 2006."  The press release stated, in relevant part:

Strong Growth from Core Servicing and Management Businesses with Significant Wins This Quarter

Investors Financial Consolidation Exceeds Expectations; Projected 2007 EPS Dilution Significantly Reduced

BOSTON--(BUSINESS WIRE)--Oct. 16, 2007--State Street Corporation announced today third-quarter earnings per share of $0.91, an increase from $0.83 earnings per share in the third quarter of 2006. Earnings per share in the third quarter of 2007 include $141 million, or $0.24 per share, of merger and integration costs associated with the July 2, 2007, acquisition of Investors Financial Services Corp. ("Investors Financial"). On an operating basis, which excludes these costs, record earnings are 1.15 per share, up 39% from the third quarter of 2006.

* * *

22

Commenting on the impact of recent market activity affecting fixed-income investments, [State Street's chairman and chief executive officer Ronald E.] Logue added, "The fixed-income markets have experienced unprecedented disruption in this past quarter. We believe we are well positioned with both our portfolio and our asset-backed commercial paper conduits. ***While liquidity in the fixed income market remains challenging, our concentration in high-quality assets in our own portfolios as well as in the conduits, have limited the impact of this disruption on our business.*** We believe that we weathered the disruption in the fixed-income market well--without significantly affecting State Street's results. We're disappointed in the performance of a small number of fixed-income strategies at State Street Global Advisors which performed below our expectation." (Emphasis added.)

69.    That same day, Defendants Logue and Resch held a conference call with investors to discuss the Company's 2007 third-quarter results.  In discussing State Street's conduit program, Defendant Logue contrasted the credit quality of the assets in the Company-administered conduits with those of State Street's peers, stating that:

We do not have concerns as to the overall quality of the underlying assets in the conduits.  It is important to help our investors understand the differences between our conduits and those of many commercial bank sponsors. We included a Moody's chart in our trends package on page 10, which you can download from our investor relations website. It provides an overview of our conduits as of September 30, 2007, versus a peer group of 30 bank sponsors of multiseller conduits as of June 30, 2007, including a summary of the asset composition and ratings of the assets held in the conduits.

70.    On the call, Defendant Resch also provided additional detail on State Street's conduit program, stating that:

What are the ratings on the assets that are held for use in the conduits? If you would please turn to slide 1. Let me make sure you're all aware. Most of the assets are pools of consumer assets and are investment grade.

Now let me detail some of the aggregate ratings of the assets within the four conduits that back the commercial paper. 62% is triple-A; 15% is double-A; 8% is single-A; and 10% is not rated by a rating agency. However, I should point out that our enterprise risk management group reviews all purchases in the conduits; and the assets in this group are structured to maintain a P-1 or similar conduit rating. Those three categories represent 95% of the total. The remaining 5% is rated triple-B.

Let me differentiate these ratings from the average ratings of holdings of a multiseller peer group using data provided by Moody's, which is graphed on

23

page 10 in the trends package provided on our website also. First, let me reiterate. The assets in State Street's sponsored conduits are not sourced from our balance sheet.

While State Street's conduits hold 62% in triple-A rated securities, a peer group of the major multiseller conduits holds 12%. While State Street's conduits hold 15% in double-A rated securities, the peer group holds 13%. While State Street holds 10% that are not rated, the peer group holds 41%. While State Street holds 5% rated as triple-B, the index of the major multiseller bank sponsors holds 13%. And while State Street holds essentially no assets rated below triple-B or below investment grade, the peer group holds 10%.

The point of this detail is to provide data that will help you differentiate generally between the commercial paper issued by our conduits and that of other programs. These comparisons may help you understand the confidence we have in the quality of our assets.

***

I realize you are probably interested in implications for State Street should assets come on to our balance sheet under existing contractual arrangements with the conduits or as a result of the consolidation of the conduits. ***We do not anticipate the consolidation of the conduits, but present the following information for purposes of illustration, given the amount of interest this topic has received.*** (Emphasis added.)

71.    On November 2, 2007, State Street filed its Quarterly Report with the SEC on Form 10-Q for the 2007 fiscal third quarter. The Company's Form 10-Q was signed by Defendants Resch and Malerba and reaffirmed the Company's financial results previously announced on October 16, 2007. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Logue and Resch, substantially similar to the certifications described in ¶56, *supra*.

72.    At a Merrill Lynch Banking and Financial Services Investor Conference on November 13, 2007, Defendants Ron Logue and Ed Resch again assured investors of the quality of the assets in State Street's conduit programs and investment portfolio. Specifically, in response to a question regarding the Company's investment portfolio, Defendant Resch stated that:

[O]ur portfolio overall is where we want it to be. It is 88% AAA, 6% AA. If you look at the direct implied -- full or implied government guarantee, it is about a third of the portfolio. If you add our student loan position into that, which has a 97% federal guarantee, it is about 43% of the portfolio as government guaranteed.

We are running it at about a 1.6 year duration. All the securities are public, are 144A and are rated. And it is diversified across asset class, geography, issuer and industry. So I think we have constructed a pretty sound portfolio. We are very comfortable with where it is, and I don't think we'd necessarily do anything better.

We believe that the subprime asset-backed securities are money good. They are all performing as we expect. Default rates are very low on them, and as we have said many times, we are comfortable with where it is.

73.    During the conference call, the Defendants were also questioned about State Street's intentions and potential need to consolidate the conduits onto the Company's balance sheet, and specifically, whether the Company was considering "potentially rightsizing or rationalizing your conduit exposure in view of the potential drain on your balance sheet if indeed you had to bring it on books."  In response, Defendant Rogue stated:

I can talk a little bit about that. That is a business we have been in since 1992. It really started as a service to our mutual fund customers to get paper for their 2a-7 money market mutual funds. It has been a great business for us, doesn't generate a lot of revenue, as you know; probably about $61 million in total revenue, I think, is what we said on that call.

But in today's environment it is $29 billion of asset-backed commercial [paper], and when you look at that versus our capital position, I can see why given the situation, people would wonder why are we doing that. Well is has worked great since 1992. As I said on the call, we have to look at that program in relation to our capital. You are not going to see that program expand, but it is something that can't contract necessarily overnight but over time. I think you will see that program looking differently in relationship to the capital that we have to support it, given the new reality that we have.

I can't tell you exactly how and when, but I can tell you directionally it is not going to go up. If anything, it is going to go down.

74.    On January 3, 2008, State Street held a conference call to announce that it would record a net charge of $279 million in the fourth quarter of 2007 to establish a reserve to address

legal exposures arising from three class action suits alleging claims to recoup losses in fixed income portfolios managed by State Street that had been improperly invested in subprime assets. During that call, Defendant Resch also addressed State Street's exposure arising from its conduits and investment portfolios:

> The overall asset quality and diversification of the conduit portfolios has not changed materially from the data we disclosed in the third-quarter 10-Q and on the third-quarter conference call. ***At this time, we believe that we do not need to consolidate the conduits.*** As of year-end, State Street had funded $2 million in commercial paper, down from $730 million we held on September 30, 2007 and also down from the $222 million we funded as of October 15, 2007.

> Our investment portfolio is performing as expected, particularly that portion of the portfolio which is invested in asset-backed securities collateralized by subprime mortgages. As of year-end, though securities totaled $6.3 billion, of which 72% are AAA-rated and 28% are AA rated. Due to paydowns, we have a credit enhancement of 40% on these securities. We have experienced no ratings downgrades to these securities; however, five securities worth $25 million in total have been placed on watch for downgrade due to recent rating agency concerns regarding certain financial guarantors.

> ***So we are confident about managing our capital position, the performance of our investment portfolio and the administration of our conduit program.*** Our operating results are expected to be very strong for both the fourth quarter and the full year. (Emphasis added.)

75.    On January 15, 2008, State Street issued a press release entitled, "State Street Reports Fourth-Quarter Earnings Per Share of $.57, Including a Net after-Tax Charge of $279 Million, or $.71 Per Share." The press release stated, in relevant part:

> 2007 Revenue Climbs 32% Compared to 2006

> $300 Billion in Assets from Wins in Servicing and $30 Billion in Assets from Wins in Asset Management Sustain Momentum in Core Business in Fourth Quarter

> BOSTON--(BUSINESS WIRE)--Jan. 15, 2008--State Street Corporation today announced 2007 fourth-quarter earnings per share of $0.57 on net income of $223 million, compared to earnings per share of $0.91 on net income of $309 million in the fourth quarter of 2006. Revenue in the fourth quarter is $2.479 billion compared to $1.622 billion in the fourth quarter of 2006. Return on

shareholders' equity is 7.7% in the fourth quarter of 2007 compared to 16.9% in the fourth quarter of 2006. Average shares outstanding for the fourth quarter of 2007 are 392 million shares. For the full year 2007, earnings of $3.45 per share on net income of $1.261 billion compares with $3.26 per share on income from continuing operations of $1.096 billion in 2006. Return on shareholders' equity in 2007 is 13.4% compared with return on shareholders' equity from continuing operations of 16.2% in 2006. Average shares for the full year 2007 are 365 million shares.

*** 

Commenting on the performance, Ronald E. Logue, State Street's chairman and chief executive officer, said, "Nearly every revenue item on our income statement increased in double digits this year, compared to 2006, resulting in 32% growth in earnings per share on an operating basis. While investment servicing and investment management fees were both strong, revenue from trading services and securities finance benefited from continuing market volatility, particularly in the fixed-income markets in the second half of 2007….

Logue added, "As we explained on our call earlier this month, we expect that by establishing the fourth-quarter reserve to address the legal exposure and other costs associated with the underperformance of certain active fixed-income strategies at State Street Global Advisors, we can address customer concerns and help to put the issue behind us, particularly given the current momentum in our business. Management fee revenue at SSgA grew 21% in 2007 compared to 2006, and SSgA continues to be a strong contributor to State Street's results. Total assets under management as of December 31, 2007, grew 13% from the level at the end of 2006, and specifically SSgA's fixed income assets increased 21% in the same period."

76.    That same day, Defendants Logue and Resch held a conference call to discuss the

Company's 2007 fourth quarter and year-end results.  Commenting on the Company's conduit

program, Defendant Resch stated:

So what happened in the fourth quarter? ***Overall, the asset-backed commercial paper program continued to perform very well, as it did in the third quarter.*** We believe that our asset quality was a major point of differentiation for the conduits during a period of time when some weaker programs exited the market and the overall asset-backed commercial paper market contracted significantly.

Our overall weighted average maturity of the commercial paper at the end of the fourth quarter of 2007 was approximately 20 days, compared to approximately 23 days at the end of the fourth quarter of 2006, and approximately 15 days at the end of the third quarter of 2007.

We disclosed that we held $730 million in State Street sponsored asset-backed

commercial paper at September 30, 2007, and $222 million at October 15, 2007, most of which was associated with our two Australian conduits, which are much smaller than either of the other two. As of December 31, 2007, we held $2 million of the asset-backed commercial paper on our balance sheet; and as of last Friday, January 11, we held $58 million of the paper, well within our typical holdings as a dealer in the paper.

***We do not anticipate the consolidation of the conduits.*** If, either due to the triggering of liquidity asset purchase agreements or due to FIN 46R we were required to acquire all of the conduits' assets or consolidate the conduits using December 31, 2007, estimated fair values, the loss would be approximately $530 million after-tax. (Emphasis added.)

77.    On February 15, 2008, State Street filed its Annual Report with the SEC on Form 10-K for the 2007 fiscal year. The Company's Form 10-K was signed by Defendants Resch and Malerba and reaffirmed the Company's financial results previously announced on January 15, 2008. The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Logue and Resch, substantially similar to the certifications contained in ¶56, *supra.*

78.    In addition, State Street's Form 10-K filing included a report by its independent registered public accounting firm, Defendant Ernst & Young, which expressed an unqualified opinion of its audit, conducted in accordance with the standards of the Public Accounting Oversight Board (United States), "of the consolidated statement of condition of State Street Corporation as of December 31, 2007, and the related consolidated statements of income, changes in shareholders' equity, and cash flows for each of the three years in the period ended December 21, 2007 of State Street Corporation."   In the report, Ernst & Young stated, among other things, that "[i]n our opinion, State Street Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007." Ernst & Young consented to the incorporation by reference of its audit opinion concerning State Street's consolidated financial statements and the effectiveness of the Company's internal control over financial reporting in the Shelf Registration Statement.

79.    On April 15, 2008, State Street issued a press release entitled, "State Street Corporation Achieves Record Revenue of $2.6 Billion in the First Quarter, up 52% from Year-Ago Quarter."  The press release stated, in relevant part:

EPS of $1.35 up 45%, Including $0.04 in Merger and Integration Costs

Strong Financial Performance Continues in Challenging Environment

BOSTON--(BUSINESS WIRE)--April 15, 2008--State Street Corporation announced today first-quarter earnings per share of $1.35, up 45% from earnings per share of $0.93 in last year's first quarter. Earnings per share in the first quarter of 2008 includes $17 million of after-tax merger and integration costs associated with the July 2007 acquisition of Investors Financial Services Corp. ("Investors Financial"), or $0.04 per share. Excluding these costs, operating earnings per share of $1.39 would have been up 49% compared to $.93 in the first quarter of 2007. Revenue of $2.577 billion in the first quarter of 2008, representing a State Street record for a quarter, is up 52% from $1.696 billion compared to the year-ago quarter and includes $220 million in revenue from the acquired Investors Financial business. Total expenses in the first quarter of 2008 of $1.774 billion are up 46.2% from $1.213 billion compared to the year-ago quarter and excluding the merger and integration costs would be $1.748 billion, up 44.1%....

Ronald E. Logue, State Street's chairman and chief executive officer, said, "I am extremely pleased with this record revenue performance, particularly in today's challenging environment. The momentum we have achieved over the past 12 months continues, despite the negative equity markets….

Servicing fee revenue was up 34% and asset management fee revenue grew 7% from the prior year's first quarter. We won $600 billion of assets in new business in servicing and $69 billion of net new business in asset management. Growth outside the U.S. continues to provide momentum. Growth in revenue was particularly strong in our trading business and our securities finance business in this volatile business environment. Growth in net interest revenue is due to a favorable U.S. rate environment as well as the successful execution of our balance sheet strategy."

Logue continued, "During the first quarter, we strengthened our regulatory capital position with strong net income of more than $500 million and the issuance of $500 million of tier-1 qualified regulatory capital."

80.    That same day, Defendants Logue and Resch held a conference call with analysts to discuss the Company's 2008 first quarter results, including rising losses in State Street's conduits.  On the call, Defendant Logue disclosed that State Street had purchased $850 million in

assets from its conduit program, stating that:

> Processing and other fees declined 26% from the prior year's first quarter and decreased slightly from the fourth quarter. The reason for this result is that we recorded a loss of $11.6 million on the purchase of $850 million of AAA assets, except for one security which was rated AA, from two of our conduits under a liquidity asset purchase agreement. Due to the market volatility, we recorded approximately $12 million of mark-to-market adjustments. Economically, we do not expect a loss; and therefore we expect to recover this adjustment as the assets mature.

81.    Defendant Resch provided additional detail regarding the losses in the conduit program, explaining that:

> Due to illiquidity in the market and pursuant to the terms of the liquidity asset purchase agreement between State Street Bank and Trust and the conduits, we were required to purchase $850 million in assets from the conduits and brought them onto our balance sheet during the first quarter. This purchase was not due to a credit event, i.e., not triggered by a default or downgrade of any underlying conduit securities, but simply due to wider spreads in the asset-backed commercial paper caused by illiquidity.
>
> These assets are primarily backed by residential mortgages and student loans; and all are rated AAA except for one which is rated AA. We classified them in the available-for-sale portfolio and, as you may recall from our earlier presentation, they are floating-rate assets. We firmly believe these are high-quality assets and, like the other securities in our investment portfolio, we expect them to mature at par.
>
> As I explained previously, this caused a small pre-tax loss of about $12 million which flowed through our income statement in the processing and other fee revenue line. We believe this amount will come back to us as the assets mature in the future.
>
> So what happened in the first quarter? Overall, in an uncertain market our asset-backed commercial paper program continued to perform well. We believe that the quality of the conduit assets continued to be a major point of differentiation for us. And as I just explained, we believe the resulting mark-to-market loss on the purchase of the small portion of the conduits' assets in the first quarter will come back to us as the assets mature.
>
> On slide 5, we provide some data showing the impact of consolidation of all the conduit assets onto our balance sheet. As you can see, assuming no management action on our part, the impact on our leverage ratio would be about 109 basis points, from 6.08% to 4.99%; and on the tangible common equity ratio, about 132 basis points, from 2.92% to 1.60%.

*We obviously would have taken action prior to quarter end if we had believed any consolidation event was imminent for March.* (Emphasis added.)

82.    In response to the disclosures revealing losses in State Street's conduits, the Company's stock dropped over 10%, from a $76.86 per share close on April 14, 2008 to close at $69.23 per share on April 15, 2008. However, State Street's stock remained artificially inflated, as Defendants continued to mislead investors regarding the Company's conduit program and the need to consolidate its conduit assets. Defendants also continued to conceal rising losses in State Street's investment portfolios and securities lending business, as well as the liability and associated business and reputational risks arising from State Street's undisclosed and illegal FX currency trading activities.

83.    On May 9, 2008, State Street filed its Quarterly Report with the SEC on Form 10-Q for the 2008 fiscal first quarter. The Company's Form 10-Q was signed by Defendants Resch and Malerba and reaffirmed the Company's financial results previously announced on April 15, 2008. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Logue and Resch, substantially similar to the certifications contained in ¶56, *supra*.

84.    As discussed above, State Street completed a $2.8 billion registered public offering of the Company's common stock on June 3, 2008. The Offering Materials specifically incorporated several of State Street's filings with the SEC, including the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2007 and the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, which contained materially untrue statements and omissions, including those set forth above in ¶¶75, 77-78, 79 and 83.

85.    On July 15, 2008, State Street issued a press release entitled, "State Street Corporation Achieves Record Revenue of $2.7 Billion in the Second Quarter, Up 39% From A Year Ago." The press release stated, in relevant part:

Earnings Per Share of $1.35 up 26%, Including $0.05 in Merger and Integration Costs

Outlook Raised for 2008 Due to Momentum from Strong Year-Over-Year and Sequential Quarter Performance

BOSTON--(BUSINESS WIRE)--July 15, 2008--State Street Corporation announced today second-quarter 2008 earnings per share of $1.35 compared to $1.07 per share for the second quarter of 2007. Earnings per share in the second quarter of 2008 includes $22 million of after-tax merger and integration costs associated with the July 2007 acquisition of Investors Financial Services Corp. ("Investors Financial"), or $0.05 per share. Excluding these costs, operating earnings per share of $1.40 would have been up 31% compared to $1.07 in the second quarter of 2007. Revenue of $2.672 billion in the second quarter of 2008 represented a State Street record and is up 39.1%, compared to $1.921 billion in the year-ago quarter. Total expenses in the second quarter of 2008 of $1.841 billion are up 35.6%, compared to $1.358 billion in the year-ago quarter and, excluding the merger and integration costs, would be $1.809 billion, up 33.2%. Total revenue on a fully taxable-equivalent basis is $2.700 billion, up 39.7% from $1.933 billion a year ago. As a result, on an operating basis, State Street generated about 650 basis points of positive operating leverage….

* * *

Logue added, "In these markets, we continue to experience strong year-over-year results in securities finance and trading, as well as net interest revenue. We are pleased to achieve positive operating leverage on both a quarter-to-quarter and on a year-over-year basis, the fifteenth consecutive quarter as measured on a year-over-year basis."

Logue concluded, "Our strong results of the quarter, plus the benefit of the $2.8 billion in equity capital that we issued in early June, enhanced the Corporation's solid capital position. Given the strength of the first half of the year, we now expect both growth in operating earnings per share to approach the high end of the 10 to 15 percent range and achievement of operating return on equity to approach the high end of the 14 percent to 17 percent range in 2008. We are also increasing our outlook for growth in revenue, expecting to exceed the high end of the 14 percent to 17 percent range in 2008. We continue to be focused on achieving positive operating leverage on an annual basis."

86.    On August 1, 2008, State Street filed its Quarterly Report with the SEC on Form 10-Q for the 2008 fiscal second quarter. The Company's Form 10-Q was signed by Defendants Resch and Malerba and reaffirmed the Company's financial results previously announced on July 15, 2008. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications,

signed by Defendants Logue and Resch, substantially similar to the certifications described in

¶56, *supra*.

87.    On October 15, 2008, State Street issued a press release entitled, "State Street

Corporation Reports Third-Quarter EPS of $1.09 Including Net Non-Operating Items of

$(0.15)."  The press release stated, in relevant part:

> Operating EPS of $1.24 is up 8% Compared to Q3 2007
>
> Strong Momentum Continues with Revenue up 24% and Operating Revenue up 12% Compared to Q3 2007 State Street Invited as One of the First Nine Financial Institutions to Take a Leadership Position in Treasury's Capital Purchase Program
>
> BOSTON--(BUSINESS WIRE)--State Street Corporation announced today third-quarter 2008 earnings per share of $1.09, an increase from $0.91 per share in the third quarter of 2007….
>
> * * *
>
> Ronald E. Logue, State Street's chairman and chief executive officer, said, "We are pleased to be one of the nine financial institutions key to the infrastructure of the global financial markets, selected by the U.S. Treasury to initiate the TARP Capital Purchase Program, a program aimed at addressing the financial turmoil and restoring confidence in the markets. Our selection demonstrates the important role that State Street plays for its customers and in the global markets and reflects our core financial strengths. Although we have always been and remain well capitalized, the program adds additional capital and affords us additional flexibility to continue our leadership role in meeting the challenges and opportunities in current markets. It's my belief that the companies that will emerge from this turmoil are those, like State Street, with the right mix of businesses, a focus on customer service, and a prudent plan for this environment. As part of this program, State Street will issue $2 billion of senior preferred shares to the U.S. Treasury along with warrants to purchase common stock with a total market price equal to about $300 million at the time of issuance, which we anticipate will be minimally dilutive to our shareholders."
>
> * * *
>
> Logue noted, "Due to the unprecedented market illiquidity in the third quarter, the unrealized after-tax mark-to-market losses at quarter end on State Street's investment portfolio have increased to $3.3 billion and in the asset-backed commercial paper conduits to $2.1 billion. ***However, as we have said in the past, the asset quality of both our investment portfolio and the conduit program remains high.***"

33

88.     On November 5, 2008, State Street filed its Quarterly Report with the SEC on Form 10-Q for the 2008 fiscal third quarter. The Company's Form 10-Q was signed by Defendants Resch and Malerba and reaffirmed the Company's financial results previously announced on October 15, 2008. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Logue and Resch, substantially similar to the certifications contained in ¶56, *supra*.

89.     The statements contained in   ¶¶54-88, were materially false and/or misleading when made because defendants misrepresented and failed to disclose: (1) that Defendants had failed to properly value and mark-to-market the securities it held and traded in its investment portfolios, improperly inflating their reported value by millions of dollars; (2) that the Company's securities lending program had been experiencing severe disruptions and losses due to improper investments in the securities lending collateral pools, requiring State Street to spend hundreds of millions of dollars to make up for losses sustained by securities lending clients to prevent their mass departure and exposing the Company to further losses and liability from customer claims; (3) that the Company's conduit program had incurred massive losses that would require State Street to consolidate the conduits onto its balance sheet and that given the losses in the conduits, its capital levels were woefully inadequate to absorb such a consolidation; (4) that, as a result, the Company's financial results were materially inflated; (5) that the Company's financial results were not prepared in accordance with GAAP; and (6) that the Company lacked adequate internal and financial controls.  In addition, and as discussed more fully below, the above statements were materially false and misleading because they concealed the existence and effects of State Street's improper FX trading activities.

**State Street Stuns the Market With Revised Risk Warnings, Disclosing Massive Losses in its Investment Portfolios, Securities Lending Business, and Conduit Programs and Acknowledging Consolidation of Conduits Would Occur Within the Year**

90.    On January 16, 2009, after the close of the markets before the Martin Luther King, Jr. holiday weekend, State Street issued a Form 8-K providing new risk disclosures that stated for the first time, among other things, that the Company "may be exposed to customer claims, financial loss, reputational damage, and regulatory scrutiny as a result of transacting purchases and redemptions relating to the unregistered cash collateral pools underlying our securities lending program at a net asset value of $1.00 per share rather than a lower net asset value based upon the market value of the underlying portfolios." The Company also added a new risk disclosure stating that "[i]f all or a significant portion of the unrealized losses in our portfolio of investment securities were determined to be other-than-temporarily-impaired ('OTTI'), we would recognize a material charge to our earnings and our capital ratios would be adversely impacted." In addition, the Company also added a new risk disclosure stating that "[o]ur business activities, including the unconsolidated asset-backed commercial paper conduits that we administer, expose us to liquidity and interest-rate risk." The Company disclosed that after-tax unrealized losses in the conduits had skyrocketed to $3.6 billion and that State Street would consolidate the conduits.

91.    An analyst from J.P. Morgan stated that the new risk disclosures—including the large increases in unrealized losses reported in State Street's securities lending portfolios and conduits—raised serious concerns regarding the Company's capital levels, including its tangible common equity ("TCE") ratio: "State Street filed an 8-K after market close to disclose very large increase in unrealized losses in its securities portfolio and in its conduits. By our estimates, pro forma tangible common equity ratio with the conduits would likely fall from an already thin level of 3% at 9/30 to below 1% at 12/31/08. TCE ratio for its on balance sheet assets would be

about 3.5% including deferred tax benefit, down from 4.8% at 9/30."

92.    On January 20, 2009, State Street issued a press release entitled, "State Street

Reports 2008 Earnings Per Share of $3.89, up 13% on a Revenue Gain of 28% Compared to

2007." The press release, in relevant part, stated:

> Full-Year Operating Earnings Per Share Increased 14% to a Record $5.21 Per
> Share on a 25% Gain in Operating Revenue
>
> BOSTON--(BUSINESS WIRE)--Jan. 20, 2009--State Street Corporation today
> announced full-year 2008 earnings of $3.89 per share on net income of $1.620
> billion compared with $3.45 per share on net income of $1.261 billion in 2007.
> Revenue in 2008 is $10.693 billion, up 28% from $8.336 billion in 2007. Return
> on common shareholders' equity in 2008 is 13.4% equal to 13.4% in 2007. In the
> fourth quarter of 2008, State Street reported earnings of $0.15 per share on net
> income of $65 million, compared to net income of $223 million, or $0.57 per
> share in the fourth quarter of 2007. Revenue in the fourth quarter of 2008 is
> $2.673 billion, up 8% from $2.479 billion in the fourth quarter of 2007. Return
> on common shareholders' equity is 2.3% in the fourth quarter of 2008 compared
> to 7.7% in the fourth quarter of 2007.
>
> * * *
>
> Reflecting the ongoing illiquidity in the markets at December 31, 2008, the after-
> tax, unrealized mark-to-market losses in the investment portfolio increased to
> $6.3 billion ($5.45 billion recorded in OCI and $.87 billion in HTM, not recorded
> in OCI), up $3.0 billion from September 30, 2008, and in the State Street-
> administered asset-backed commercial paper conduits increased to $3.6 billion
> up $1.4 billion from September 30, 2008. Since year end the unrealized after-tax
> losses in the investment portfolio have improved $400 million to $5.9 billion as
> of Friday, January 16, 2009.

93.    In response to the above revised risk disclosures and the revelation of massive

losses incurred by the Company, the price of State Street common stock plummeted almost 60%

in a single day—from a close of $36.35 per share on January 16, 2009 to $14.89 per share on

January 20, 2009—wiping out over $9 billion in shareholder value. However, even following

this massive corrective disclosure, which removed significant level of artificial inflation in State

Street's stock price, the Defendants continued to mislead the market regarding the Company's

involvement in the FX trading scheme.

**State Street Continues to Mislead Investors Regarding the FX Trading Scheme**

94.    On February 27, 2009, State Street filed its Annual Report with the SEC on Form 10-K for the 2008 fiscal year. The Company's Form 10-K was signed by Defendants Resch and Malerba and reaffirmed the Company's financial results previously announced on January 20, 2009. The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Logue and Resch, substantially similar to the certifications contained in ¶56, *supra*.

95.    On April 21, 2009, State Street issued a press release entitled, "State Street Corporation Reports First-Quarter Earnings Per Share of $1.02 on Total Revenue of $2.0 Billion; Ongoing Expense Controls Drive Positive Operating Leverage; Progress Made On TCE Improvement Plan." The press release stated, in relevant part:

> BOSTON--(BUSINESS WIRE)--Apr. 21, 2009-- State Street Corporation today announced first-quarter earnings per common share of $1.02, a decline from earnings per share of $1.35 in last year's first quarter. Revenue of $2.002 billion in the first quarter of 2009 is down 22.3% from $2.577 billion in the year-ago first quarter. Total expenses in the first quarter of 2009 of $1.304 billion are down 26.5% from $1.774 billion compared to the year-ago first quarter. For the first quarter of 2009, return on common shareholders' equity was 15.7%, down from 18.7% in the first quarter of 2008.
>
> * * *
>
> FIRST-QUARTER 2009 RESULTS VS. FOURTH QUARTER 2008
>
> Earnings per share of $1.02 in the first quarter of 2009 on revenue of $2.002 billion, compares with $0.54 per share in the fourth quarter of 2008 on revenue of $2.673 billion. Expenses in the first quarter of 2009 are $1.304 billion compared with $2.311 billion in the fourth quarter of 2008. Return on common shareholders' equity is 15.7% in the first quarter of 2009 compared to 8.4% in the fourth quarter of 2008. References to fourth-quarter 2008 results are to the updated results announced on February 5, 2009.
>
> * * *
>
> Servicing fees are $766 million, down 9% from $842 million in the fourth quarter and includes the impact of an 11% decline in daily average equity valuations. Management fees are $181 million, down 13% from $209 million

primarily due to a 15% decline in average month-end equity valuations. Trading services revenue is $245 million, down 41% from $418 million primarily due to decreased volatility and lower volumes in the foreign exchange markets and to a decline in our core brokerage business as well as the impact of market values on the trading account. Securities finance revenue is $181 million, down 45% from the prior quarter primarily due to lower spreads as the benefit of the Federal Reserve's December rate reductions dissipates as well as lower demand. Processing fees and other revenue declined to $49 million from $83 million due to lower revenue from structured products. Net interest revenue on an operating basis is $589 million, down 27% from $811 million, due primarily to the decline in Libor rates after year end and narrower spreads in both the investment portfolio and on customer deposits.

96.    On May 4, 2009, State Street filed its Quarterly Report with the SEC on Form 10-Q for the 2009 fiscal first quarter. The Company's Form 10-Q was signed by Defendants Resch and Malerba and reaffirmed the Company's financial results previously announced on April 21, 2009. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Logue and Resch, substantially similar to the certifications contained in ¶56, *supra*.

97.    On July 21, 2009, State Street issued a press release entitled, "State Street Corporation Reports Second-Quarter 2009 Earnings Per Share of $0.79 before Extraordinary Loss Due to Conduit Consolidation, Which Includes Previously Disclosed Repayment of TARP CPP of $0.23 Per Share." The press release stated, in relevant part:

Operating-Basis Earnings Per Share Are $1.04 in Second Quarter

Fee Revenue Increased 7% Compared to First Quarter and Continued Expense Control Drives Q2 2009 Positive Operating Leverage on an Operating Basis, Relative to Both Q2 2008 and Q1 2009

BOSTON--(Business Wire)– State Street Corporation today announced second-quarter results per common share of $(7.12), including an after-tax extraordinary loss of $(7.91) per share related to the effect of the previously disclosed consolidation of the State Street-administered asset-backed commercial paper (ABCP) conduits onto the Company`s balance sheet, $(0.23) per share related to repayment of the U.S. Treasury`s TARP CPP investment, and $(0.02) per share in merger and integration costs associated with the 2007 acquisition of Investors Financial Services Corp. ("Investors Financial"). Revenue of $2.122 billion in the second quarter of 2009 is down 20.6% from $2.672 billion in the year-ago

second quarter. Total expenses in the second quarter of 2009 of $1.364 billion are down 25.9% compared to $1.841 billion in the year-ago second quarter. As reflected in the after-tax per share loss noted above, the Company recorded an extraordinary pre-tax loss in the second quarter of $(6.096) billion as a result of the previously reported consolidation of the ABCP conduits. For the second quarter of 2009, before the extraordinary loss and reflecting the effect of the equity issuances in 2008 and 2009, return on common shareholders` equity was 13.0%, down from 18.6% in the second quarter of 2008.

* * *

Logue continued, "Fee revenue in the second quarter increased 7% from the first quarter. This performance, combined with our continued focus on expense control, resulted in 500 basis points of positive operating leverage compared to the second quarter of 2008 and 110 basis points on a sequential-quarter basis, each on an operating basis. We remain focused on what we can control–servicing our customers, managing our expenses and investing for the future."

SECOND-QUARTER 2009 RESULTS VS. FIRST QUARTER 2009

The GAAP loss per share of $(7.12) in the second quarter of 2009 on revenue of $2.122 billion, compares with earnings per share of $1.02 per share in the first quarter of 2009 on revenue of $2.002 billion. Expenses in the second quarter of 2009 are $1.364 billion, compared with $1.304 billion in the first quarter of 2009. Return on common shareholders` equity is 13.0% in the second quarter of 2009, which excludes the impact of the extraordinary loss, compared to 15.7% in the first quarter of 2009.

* * *

Trading services revenue is $310 million, up 27% from $245 million primarily due to strength in brokerage and other fee revenue. Securities finance revenue is $201 million, up 11% from the prior quarter primarily due to higher spreads as well as higher volumes.

98.    On August 10, 2009, State Street filed its Quarterly Report with the SEC on Form 10-Q for the 2009 fiscal second quarter. The Company's Form 10-Q was signed by Defendants Resch and Malerba and reaffirmed the Company's financial results previously announced on July 21, 2009. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Logue and Resch, substantially similar to the certifications contained in ¶56, *supra*.

99.    The statements contained in ¶¶54-88 and ¶¶94-98 were materially false and/or misleading when made because defendants misrepresented and failed to disclose: (1) that the Company had been engaged in a decade-long scheme to improperly and illegally overcharge its institutional clients for FX trades; (2) that State Street had derived millions of dollars in illegally-obtained revenue from these trades; (3) that these activities had materially inflated the Company's reported financial results; (4) that State Street's financial results were not prepared in accordance with GAAP; and (5) that, contrary to Defendants' prior representations, State Street lacked adequate internal and financial controls.

## Disclosures Revealing the FX Trading Fraud

100.    On October 20, 2009, California Attorney General Edmund G. Brown Jr., issued a press release exposing State Street's illegal FX trading scheme.  The press release, entitled "Brown Sues State Street Bank for Massive Fraud Against CalPERS and CalSTRS," stated, in relevant part:

> SACRAMENTO - Seeking to recover more than $200 million in illegal overcharges and penalties, Attorney General Edmund G. Brown Jr. today announced that he has filed suit against State Street Bank and Trust -- one of the world's leading providers of financial services to institutional investors -- for committing "unconscionable fraud" against California's two largest pension funds -- CalPERS and CalSTRS.
>
> The suit, which was unsealed today by a Sacramento Superior Court judge, contends that Boston-based State Street illegally overcharged CalPERS and CalSTRS for the costs of executing foreign currency trades since 2001.
>
> "Over a period of eight years, State Street bankers committed unconscionable fraud by misappropriating millions of dollars that rightfully belonged to California's public pension funds," Brown said. "This is just the latest example of how clever financial traders violate laws and rip off the public trust."
>
> The case was originally filed under seal by whistleblowers - "Associates Against FX Insider Trading," who alleged that State Street added a secret and substantial mark-up to the price of interbank foreign currency trades. The interbank rate is the price at which major banks buy and sell foreign currency.
>
> Subsequently, Brown launched an independent investigation into the allegations.

Brown's investigation revealed that State Street was indeed overcharging the two funds. Despite being contractually obligated to charge the interbank rate at the precise time of the trade, State Street consistently charged at or near the highest rate of the day, even if the interbank rate was lower at the time of trade.

Additionally, State Street concealed the fraud by deliberately failing to include time stamp data in its reports, so that the pension funds could not determine the true execution costs by verifying when State Street actually executed the trades. Commenting on this deception, one State Street senior vice president said to another executive that "if providing execution costs will give [CalPERS] any insight into how much we make off of FX transactions, I will be shocked if [State Street] or anyone would agree to reveal the information."

Brown's office estimates that the pension funds were overcharged by more than $56.6 million over eight years. The lawsuit asks for relief in the amount of triple California's damages, civil penalties of $10,000 for each false claim; and recovery of costs, attorneys' fees and expenses. It is estimated that damages and penalties could exceed more than $200 million.

101.    On this news, shares of State Street declined $4.41 per share, or 8.44%, to close at $47.84 per share on October 20, 2009 on heavy trading volume.

## CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired State Street's securities between October 17, 2006 and October 19, 2009, inclusive (the "Class Period") and who were damaged thereby and on behalf of all persons who purchased or otherwise acquired State Street's common stock pursuant and/or traceable to the Offering.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

103.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, State Street's securities were actively traded on New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes

that there are hundreds or thousands of members in the proposed Class. Millions of State Street shares were traded publicly during the Class Period on the NYSE and as of October 30, 2009, State Street had 494,665,224 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by State Street and/or its transfer agent and from the Underwriter Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

104.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

105.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

106.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a.   Whether the federal securities laws were violated by Defendants' acts as alleged herein;

        b.   Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of State Street;

        c.   Whether the Shelf Registration Statement issued by State Street contained untrue statements of material facts or omitted to state material information;

d.  Whether the Offering Materials issued by State Street contained untrue statements of material facts or omitted to state material information; and

e.  To what extent the members of the Class have sustained damages and the proper measure of damages.

107.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

108.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

109.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against State Street and the Executive Defendants

110.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

111.   During the Class Period, State Street and the Executive Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase State Street's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

112.   State Street and the Executive Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for State Street's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

113.   State Street and the Executive Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about State Street's financial well-being and prospects, as specified herein.

114.   State Street and the Executive Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of State Street's value and performance and continued substantial growth, which included the

making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about State Street and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

115.    Each of the Executive Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Executive Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

116.    The Executive Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing State Street's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.

As demonstrated by the Executive Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Executive Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

117.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of State Street's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired State Street's securities during the Class Period at artificially high prices and were damaged thereby.

118.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that State Street was experiencing, Plaintiff and other members of the Class would not have purchased or otherwise acquired their State Street securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

119.    As a direct and proximate result of State Street's and the Executive Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

120.    By virtue of the foregoing, State Street and the Executive Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against the Executive Defendants

121.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

122.    The Executive Defendants acted as controlling persons of State Street within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

123.    In particular, each of the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

124.    As set forth above, State Street and the Executive Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Executive Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT III

### Violations Of Section 11 Of The Securities Act Against State Street, the Executive Defendants (Except Defendant Malerba), the Director Defendants and the Underwriter Defendants and Auditor Defendant

125.    This Count is asserted against State Street, the Executive Defendants (except for Defendant Malerba), the Underwriter Defendants and the Auditor Defendant for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired the securities sold pursuant and/or traceable to the Offering.

126.    Liability under this Count is predicated on these Defendants' respective participation in the Offering, which was conducted pursuant to the Shelf Registration Statement. The Shelf Registration Statement contained untrue statements and omissions of material fact. This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

127.    The Shelf Registration Statement contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading.  The specific documents

containing such untrue statements and omissions that were incorporated by reference in the Shelf

Registration Statement with regard to the Offering are identified in ¶50.

128.    By reason of the foregoing, the Defendants named in this Count are liable for

violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class

who purchased or otherwise acquired the securities sold pursuant and/or traceable to the Offering

and the Shelf Registration Statement.

## COUNT IV

### For Violations Of Section 12 Of The Securities
### Act Against State Street And The Underwriter Defendants

129.    This Count is asserted against State Street and the Underwriter Defendants for

violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all

members of the Class who purchased or otherwise acquired State Street securities pursuant

and/or traceable to the Offering.

130.    State Street and the Underwriter Defendants were sellers, offerors, and/or

solicitors of sales of the securities issued in the Offering pursuant to the Offering Materials.

These Offering Materials, including prospectuses, prospectus supplements and pricing

supplements incorporated therein, contained untrue statements of material fact and omitted other

facts necessary to make the statements not misleading, and failed to disclose material facts, as set

forth in the charts provided herein.

131.    By reason of the foregoing, State Street and the Underwriter Defendants are liable

for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the

Class who purchased securities sold pursuant or traceable to the Offering pursuant to the

Offering Materials.

## COUNT V

**For Violations Of Section 15 Of The Securities Act
Against The Executive Defendants (Except Defendant Malerba)
And The Director Defendants**

132.    This Count is asserted against the Executive Defendants (except Defendant Malerba) and the Director Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired State Street securities sold pursuant and/or traceable to the Offering.

133.    At times relevant hereto, the Executive and Director Defendants were controlling persons of State Street within the meaning of Section 15 of the Securities Act.  Each of the Executive and Director Defendants served as an executive officer and/or director of State Street prior to and at the time of the Offering.

134.    The Executive and Director Defendants at times relevant hereto participated in the operation and management of State Street, and conducted and participated, directly and indirectly, in the conduct of State Street's business affairs.  As officers and directors of a publicly owned company, the Executive and Director Defendants had a duty to disseminate accurate and truthful information with respect to State Street's financial condition and results of operations. Because of their positions of control and authority as officers or directors of State Street, the Executive and Director Defendants were able to, and did, control the contents of the Shelf Registration Statement, which contained materially untrue financial information.

135.    By reason of the foregoing, the Executive and Director Defendants are liable under Section 15 of the Securities Act, to the same extent that State Street is liable under Sections 11, 12(a)(2) of the Securities Act, to Plaintiffs and the other members of the Class who purchased securities pursuant and/or traceable to the Offering pursuant to the Shelf Registration Statement and/or the applicable Offering Materials.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

   a.  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

   b.  Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

   c.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

   d.  As to the claims set forth under the Securities Act (Sections 11, 12(a)(2) and/or 15), awarding rescission or a recessionary measure of damages; and

   e.  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


DATED: January 15, 2010



                                        BERMAN DEVALERIO

                                        /s/ Jeffrey C. Block
                                        Jeffrey C. Block (BBO 600747)
                                        One Liberty Square
                                        Boston, MA 02109
                                        Telephone: (617) 542-8300
                                        Fax: (617) 542-1194
                                        Email: jblock@bermandevalerio.com